IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PATRICIA ANNE ORDWAY,**<br><br>                                        Petitioner,<br><br>          **v.**<br><br><br>**MILLER, Warden,**<br><br>                                        Respondent. | **Case No. 1:11-cv-00616 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

        Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Peter W. Thompson of the office of the California Attorney General.

**I.        PROCEDURAL BACKGROUND**

        Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Calaveras, following her conviction by jury trial on December 6, 2006, for first degree murder, elder abuse, financial elder abuse, forgery and grand theft. (Lodged Doc. 1, Clerk's Tr. at 436-39.) On January 24, 2007, Petitioner was sentenced to a prison term of life without the possibility of parole. (Id.)

        Petitioner filed a direct appeal with the California Court of Appeal, Third Appellate

1   District. On January 28, 2009, the appellate court affirmed the conviction, but struck the

2   restitution fine imposed. (Lodged Docs. 2-4.) Petitioner's petition for review was

3   summarily denied by the California Supreme Court on April 15, 2009. (Lodged Docs. 5-

4   6.)

5          After exhausting her direct review, Petitioner filed twelve petitions for post-

6   conviction collateral relief in the form of petitions for habeas corpus with the California

7   Courts. (See Lodged Docs. 7-30.) All of the petitions were denied. Specifically, Petitioner

8   filed five petitions with the Calaveras County Superior Court (Lodged Docs. 7-8, 11-12,

9   19-22, and 25-26), four petitions with the Third District Court of Appeals (Lodged Docs.

10  9-10, 15-16, 23-24, and 27-28), and three petitions with the California Supreme Court

11  (Lodged Docs. 13-14, 17-18, 29-30.)  To the extent that certain petitions contain relevant

12  challenges to Petitioner's claims, the petitions are described in detail below.

13         Petitioner filed the instant federal habeas petition on April 21, 2011, and filed an

14  amended petition on November 9, 2011. (ECF No. 17.) The amended petition raised the

15  following ten grounds for relief: 1) trial counsel was ineffective in failing to conduct pre-

16  trial investigations and hire experts to rebut testimony; 2) trial counsel was ineffective

17  due to a conflict of interest; 3) trial counsel was ineffective in failing to thoroughly review

18  police reports and for allowing tainted evidence into trial; 4) the statements of the

19  prosecution violated Petitioner's right to a fair trial; 5) the prosecution presented

20  destroyed evidence and introduced tainted evidence at trial; 6) ineffective assistance of

21  appellate counsel; 7) the trial court allowed improper hearsay evidence to be introduced

22  at trial; 8) the trial court violated Petitioner's due process by imposition of the witness-

23  murder special circumstance; 9) Petitioner was not provided the opportunity to confront

24  and cross-examine certain witnesses; and 10) that due to prejudicial statements of the

25  court, Petitioner was denied the right to a fair trial and impartial jury.

26         Respondent filed an answer to the petition on April 24, 2012. (Answer, ECF No.

27  31.) Petitioner filed a traverse on May 10, 2012. (Traverse, ECF No. 32.)

28

## II.   STATEMENT OF THE FACTS[1]

1. The Discovery of the Victim's Body and the Cause and Timing of Death

On September 17, 2004, about 6:20 a.m., the lifeless body of 77-year-old Ray Shires was discovered lying in the parking lot of the Avery Tire Center in Avery. His car was still in the lot. Shires died from an extensive head beating in which he suffered 23 injuries consistent with the use of a claw hammer.

Based on information from the owner of Avery Tire Center, from an adjoining business owner, and from a passerby, together with evidence found at the crime scene, a criminalist opined that the crime occurred between 9:30 p.m. and 11:15 p.m. on September 16, 2004.

2. Defendant and Her Relationship to Victim

Defendant, who was on Social Security disability, worked for Shires as a housekeeper. She was having financial difficulties around the time of Shires's death.

About a week before his death, Shires told Amy S. and Debbie N. that he was looking for a housekeeper.[fn2] He wanted them or someone they knew personally to do the job. Repeatedly, Shires said he needed someone he could trust who would not take advantage of him. He did not want anyone who would steal from him. He added that he had given loans to a housekeeper before, and he did not want to do that. According to Debbie, Shires said he was having a problem with his current housekeeper.

FN2: To maintain privacy, we will use only last name initials for witnesses.

According to defendant's best friend, Rhonda S., defendant did construction activities and was strong. When Rhonda talked to defendant the day after Shires was found dead, defendant told Rhonda that her (defendant's) fingerprints would be found on the passenger door of Shires's car because she and Shires had taken a drive in his car the night before he was found dead, and that Shires would have dog hair on him because she had allowed Shires to touch her. Rhonda thought it was odd that defendant had relayed this information.

Defendant told police that Shires paid her $ 150 each time she cleaned his house and visited him, which occurred numerous times. When the police asked defendant about her activities on the night of September 16, 2004, she provided varying and inconsistent accounts in response to police skepticism. Defendant's car had been seen at Shires's house on the afternoon of that day.

3. Physical and Forensic Evidence

---

[1] The Third District Court of Appeal's summary of the facts in its January 28, 2009 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

Just a few days after the discovery of Shires's body, evidence was found on some vacant property in Angels Camp owned by Debra H. that was about a 10-minute drive from the Avery Tire Center. This evidence included Shires's wallet (which contained his driver's license and other identification), his checkbook (with cover), a hammer (and some latex gloves), a pair of jeans, a T-shirt, a linen sheet, a cell phone charger, and a toilet wax ring box (which contained some torn papers and was sealed shut with black electrical tape). These items, in turn, disclosed the following:

--Defendant's fingerprints were found inside the back cover of Shires's checkbook cover.

--Blood found on the hammer matched Shires's DNA.

--The size of the jeans was consistent with jeans found at defendant's house. The jeans discovered on Debra H.'s property had spots that tested positive for blood, and defendant's and Shires's DNA were on the jeans.

--The T-shirt resembled the T-shirt defendant had been wearing at a local store on September 16, 2004, as captured on a video surveillance tape (the T-shirt had the word Arnold and a picture of frogs on it). Spots on the T-shirt tested positive for blood.

--The linen sheet had a logo of Lodi Memorial Hospital. Defendant's former husband had operated an ambulance service that transported patients to Lodi.

--The cell phone charger was the same type as one that Shires had purchased.

--And the torn pieces of paper found within the toilet wax ring box were reassembled to include: (1) Shires's check No. 699, made out to Mark S. for $ 2,500, which defendant had endorsed but unsuccessfully tried to cash at the Pacific State Bank around September 15, 2004; (2) a bank deposit slip for $ 2,500 dated September 14, 2004, with defendant's name and account number and Shires's check No. 699 on it; (3) another deposit slip dated September 14, 2004, with defendant's signature on it showing a deposit of $ 2,500 pursuant to a corresponding check from Shires, check No. 700; and (4) a $ 2,500 check from Shires dated August 16, 2004, payable to defendant. Check Nos. 699 and 700, along with their carbons, were found missing from Shires's checkbook. As for the toilet wax ring box in which these torn-up documents were found, evidence showed that defendant went with her father to Home Depot on September 15, 2004, where he bought three toilets, one of which she installed at his house and another she took home with her. Defendant installed a new toilet at her home on September 17; a wax ring is a device used to reseat a toilet.

The bank records of Shires and defendant provided further revelations. Shires's records revealed two checks made out to defendant: check No. 675 for $ 2,500, dated August 16, 2004, and check No. 700 for $ 2,500, dated September 14, 2004. It appeared that the handwriting on check No. 675 had been used to trace the writing on check No. 700. Defendant told an investigating police officer that Shires had given her check No. 675 as a loan to buy a used red Subaru, and had given her blank check No. 700 for housecleaning and minor sexual contact and told

4

her she could write it out for $ 2,500. Defendant had saved a photocopy of check No. 675, so she used it to trace the writing for check No. 700. Defendant acknowledged she was taking advantage of Shires.

Defendant's bank records showed a deposit of $ 2,500 (less $2,000 cash received) from Shires's check No. 675 on August 16, 2004, and a deposit of $ 2,500 (less $ 500 cash received) from Shires's check No. 700 on September 14, 2004.

4. Defendant's Letters from Jail

While in jail, defendant wrote two letters to Shelly C. In the letters, defendant claimed that Shires must have been robbed and murdered by Joyce P., Joyce's son and the son's wife, who in turn had framed defendant by dumping the evidence found on the Angels Camp property (i.e., Debra H.'s property). (For a period of time, defendant had allowed Joyce and her clan to live at defendant's residence, until they were asked to move out by defendant's parents, who owned the residence.) Defendant wrote that, to prove her innocence, she needed Shelly to find a person who would lie to defendant's lawyer, the district attorney and the police using a false story that defendant had concocted. Defendant offered to pay Shelly and the other person for this assistance with substantial lottery winnings she had never told anyone about. Defendant admitted this scheme in her trial testimony, but maintained it was done to prove her innocence. Defendant added at trial that Joyce had forged checks on Shires's account and blackmailed defendant into cashing them.

From jail, defendant also wrote to Ruby J. and asked her to relay the concocted story to the police.

5. Third Party Culpability

The manager of an Angels Camp mini-mart told Detective Jim Stenquist that one of her store clerks had seen a woman--who did not fit defendant's description--in the store with blood or oil on her hands between 7:00 and 8:00 p.m. the night Shires was killed. A customer at the store who had overheard the manager and the detective talking told the detective that she (the customer) knew of the woman the manager was describing, and that the woman had been working on her car at the residence of Billy B., who lived about three blocks from the mini-mart.

Detective Stenquist then checked with Billy B., who echoed the customer's account. Billy stated that he and a woman named Cheryl S. had been working on her car "the last few weeks," that they had "probably" worked on the car on the evening of September 16, 2004, and that he had sent Cheryl to the mini-mart "to get items." The detective then confirmed that indeed it was Cheryl's registered car on Billy's property--with its hood up and surrounded by cans of motor oil and transmission fluid (which is red). The detective also checked with the original source of the information regarding the allegedly bloody-handed woman, the mini-mart store clerk (Ann F.), who said the substance on the woman in the store "possibly could have been motor oil." Based on all this information, Detective Stenquist did not contact Cheryl, concluding that the woman in the mini-mart with the substance on her hands did not pertain to the Shires murder.

Ann F., the mini-mart store clerk, testified for the defense. She

1
2
3

stated that on a September 2004 evening, between 9:30 and 10:00 p.m., a woman, who was not defendant, came into the store with dried blood all over her hands. Ann did not think the substance was transmission fluid, but admitted she had never seen dried transmission fluid. The woman wandered around the store, bought a snack, and ate it in the store.

4
5

The evidence of the statements to Detective Stenquist from the (eavesdropping) mini-mart customer and from Billy B. is the subject of defendant's first issue on appeal, to which we turn now.

6

People v. Ordway, 2009 Cal. App. Unpub. LEXIS 727, 1-9 (Cal. App. 3d Dist. Jan. 28, 2009).

7
## III.    DISCUSSION

8
### A.    Jurisdiction

9    Relief by way of a petition for writ of habeas corpus extends to a person in

10   custody pursuant to the judgment of a state court if the custody is in violation of the

11   Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

12   2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

13   suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

14   conviction challenged arises out of the Calaveras County Superior Court, which is

15   located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly,

16   the Court has jurisdiction over the action.

17
### B.    Legal Standard of Review

18   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

19   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

20   filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

21   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

22   the AEDPA; thus, it is governed by its provisions.

23   Under AEDPA, an application for a writ of habeas corpus by a person in custody

24   under a judgment of a state court may be granted only for violations of the Constitution

25   or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

26   7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

27   state court proceedings if the state court's adjudication of the claim:

28   (1)   resulted in a decision that was contrary to, or involved an

6

1    unreasonable application of, clearly established federal law, as
     determined by the Supreme Court of the United States; or

2    (2) resulted in a decision that was based on an unreasonable
3    determination of the facts in light of the evidence presented in the State
     court proceeding.

4    28 U.S.C. § 2254(d).

5              1.    Contrary to or an Unreasonable Application of Federal Law

6          A state court decision is "contrary to" federal law if it "applies a rule that

7    contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

8    that are materially indistinguishable from" a Supreme Court case, yet reaches a different

9    result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

10   "AEDPA does not require state and federal courts to wait for some nearly identical

11   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

12   even a general standard may be applied in an unreasonable manner" Panetti v.

13   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

14   "clearly established Federal law" requirement "does not demand more than a 'principle'

15   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

16   decision to be an unreasonable application of clearly established federal law under §

17   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

18   (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

19   71 (2003).  A state court decision will involve an "unreasonable application of" federal

20   law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at

21   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

22   Court further stresses that "an *unreasonable* application of federal law is different from

23   an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

24   U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

25   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

26   correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

27   U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

28   have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

1  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

2  Federal law for a state court to decline to apply a specific legal rule that has not been

3  squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

4  (2009), quoted by Richter, 131 S. Ct. at 786.

5           2.    Review of State Decisions

6       "Where there has been one reasoned state judgment rejecting a federal claim,

7  later unexplained orders upholding that judgment or rejecting the claim rest on the same

8  grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

9  "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

10  (9th Cir. 2006). Determining whether a state court's decision resulted from an

11  unreasonable legal or factual conclusion, "does not require that there be an opinion from

12  the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

13  "Where a state court's decision is unaccompanied by an explanation, the habeas

14  petitioner's burden still must be met by showing there was no reasonable basis for the

15  state court to deny relief."  Id. ("This Court now holds and reconfirms that § 2254(d) does

16  not require a state court to give reasons before its decision can be deemed to have been

17  'adjudicated on the merits.'").

18       Richter instructs that whether the state court decision is reasoned and explained,

19  or merely a summary denial, the approach to evaluating unreasonableness under §

20  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

21  or theories supported or, as here, could have supported, the state court's decision; then

22  it must ask whether it is possible fairminded jurists could disagree that those arguments

23  or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

24  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

25  was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

26  authority to issue the writ in cases where there is no possibility fairminded jurists could

27  disagree that the state court's decision conflicts with this Court's precedents."  Id.  To put

28  it yet another way:

8

As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

## IV.   REVIEW OF PETITION

### A.   Procedural Bar

Respondent asserts that eight of Petitioner's ten claims are procedurally barred as a result of various state laws. The Court shall examine each claim of procedural bar.

#### 1.   Claims 1, 4, 9, and 10

##### a.   Procedural History

1    In her first, fourth, ninth, and tenth claims, Petitioner contends that her rights
2    under the Fifth, Sixth, and Fourteenth Amendments were violated by her counsel's
3    failure to hire expert witnesses, to fully conduct pre-trial discovery, to subpoena
4    important material witnesses, and to provide Petitioner with all known discovery prior to
5    trial. (Am. Pet., ECF No. 17 at 9-14, 19-23, 35-38.) In addition to these general
6    allegations Petitioner asserts numerous sub-claims within claims 1, 4, 9 and 10. For
7    example, within claim one, Petitioner asserts that counsel was ineffective for failing to
8    request a dismissal of the case in light of alleged destruction of evidence, that counsel
9    was ineffective for failing to have DNA testing performed on the victims fingernails, that
10   counsel failed to object to admittance of latex gloves into evidence, that counsel failed to
11   present any expert witnesses in support of the defense, that counsel was ineffective for
12   failing to view the mini-mart security video in the presence of the manager and sales
13   clerk of the store, that counsel failed to examine a witness regarding another woman
14   who was in the mini-mart on the night of the crime, that counsel failed to provide
15   Petitioner all discovery paperwork prior to trial, that counsel allowed favorable evidence
16   to be lost that would have supported Petitioner's alibi, that counsel was incompetent for
17   failing to ask her certain questions during her direct examination, and that counsel failed
18   to object when the prosecution misstated facts in evidence and stated that evidence was
19   presented when it was not.  (Id. at 9-12.) These sub-claims are exemplary of Petitioner's
20   sub-claims as to claim one. As stated, many more sub-claims are included in claims 1, 4,
21   9 and 10 of the petition.

22   Petitioner brought claims 1, 4, 9, and 10 of her federal Petition in a state court
23   petition for writ of habeas corpus filed in the Calaveras County Superior Court on August
24   31, 2009. (Lodged Doc. 7.) The Petition was summarily denied without prejudice based
25   upon Petitioner's failure to file a verified petition under California law. (Lodged Doc. 8.)
26   Petitioner then filed a petition for writ of habeas corpus in the Third District Court of
27   Appeal, asserting the same claims and sub-claims on December 2, 2009. (Lodged Doc.
28   9.) The petition was denied without prejudice to Petitioner properly filing a verified

1  petition in the Superior Court of Calaveras County on December 17, 2009. (Lodged Doc

2  10 (citing Cal. Pen. Code § 1474 and People v. Seijas 36 Cal.4th 291, 307 (2005).)

3  Finally, the claims and sub-claims were raised in the California Supreme Court and

4  denied without comment on August 11, 2010. (Lodged Docs. 13-14.)

5  Under the "look through" doctrine the Court relies on the last reasoned state court

6  decision. Ylst v. Nunnemaker, 501 U.S. at 803. Here, the last reasoned decision was the

7  denial by the Third District Court of Appeal which denied the state petition for writ of

8  habeas corpus because Petitioner failed to verify her petition, citing to California Penal

9  Code § 1474 and People v. Seijas, 36 Cal.4th at 307.[1]

10  b.  Respondent's Contentions

11  California Penal Code § 1474 requires state habeas petitions to be verified by the

12  oath or affirmation of the party making the application. Section 1474 was enacted in

13  1872 and California courts have enforced the statutory requirement that a petition be

14  verified. See, e.g., Ex parte Newell, 64 Cal.App. 103 (1923); People v. Manson, 61

15  Cal.App.3d 102 (1976). Accordingly, Respondent contends that the state procedural rule

16  was in effect and firmly established and should serve as a procedural bar to prevent

17  federal review of the petition.  Alternatively, Respondent argues that the claims were not

18  denied on the merits in state court, and therefore were not exhausted.

19  c.  Analysis: Technical Exhaustion and Procedural Default

20  The Supreme Court described the procedural default doctrine in Coleman v.

21  Thompson, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). The doctrine

22  denies review of a petitioner's federal habeas claim when the claim was rejected in state

23  court based on an adequate and independent state procedural bar. Id. at 729-30.

24  In all cases in which a state prisoner has defaulted his federal claims in
   state court pursuant to an independent and adequate state procedural
25  rule, federal habeas review of the claims is barred unless the prisoner can
   demonstrate cause for the default and actual prejudice as a result of the
26

27  [1] The decision, in its entirety reads: "The petition for writ of habeas corpus is denied without prejudice to filing a properly verified petition (See Pen. Code. § 1474) in the Superior Court of Calaveras County. (See, e.g., People v. Seijas, 36 Cal.4th at 307.)" (Lodged. Doc. 10.)

28

1   alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

2   Id. at 750.

3   A procedural bar must have risen from explicit and independent state law. Id. at

4   735; Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1988). For

5   the procedural bar to be adequate, the bar must be clear, consistently applied, and well

6   established at the time of the alleged default. Collier v. Bayer, 408 F.3d 1279, 1284 (9th

7   Cir. 2005). Also, the opinion of the last state court rendering a judgment in the case must

8   clearly and expressly state that its judgment rests on a state procedural bar. Harris, 489

9   U.S. at 263; see Coleman, 501 U.S. at 729-30.

10   Here, the Court is presented a novel issue: Does the state court's dismissal

11   without prejudice for failure to sign and verify the petition serve as a procedural bar? On

12   one hand, the state court did not reach the merits of the petition based on a state

13   procedural rule. However, in dismissing the petition without prejudice the state court did

14   not foreclose consideration of the claims. Petitioner needed only to re-file a signed and

15   verified copy of the petition to obtain state review.

16   No federal courts have relied on the verification requirement of California Penal

17   Code § 1474 to support finding a procedural bar. However, the Court need not

18   determine the issue here, as other grounds support a finding that the claims are

19   procedurally barred. Since Petitioner did not re-file the habeas petitions, she failed to

20   obtain state decisions on the merits of the claims, and therefore the claims are not

21   exhausted.

22   Habeas petitioners who wish to challenge either their state court conviction or the

23   length of their confinement in state prison must first exhaust state judicial remedies. 28

24   U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34, 107 S. Ct. 1671, 95 L.

25   Ed. 2d 119 (1987). To exhaust state judicial remedies, a California state prisoner must

26   present the California Supreme Court with a fair opportunity to rule on the merits of every

27   issue raised in his or her federal habeas petition. 28 U.S.C. § 2254(b), (c); Granberry,

28   481 U.S. at 133-34; see also Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130

1    L. Ed. 2d 865 (1995). If the claim was not presented to the state's highest court on direct

2    appeal, state collateral remedies must be exhausted. <u>Reiger v. Christensen</u>, 789 F.2d

3    1425, 1427 (9th Cir. 1986).

4            Even where a claim has not been properly presented to the state's highest court,

5    a petitioner has satisfied the technical requirements of exhaustion if she no longer has

6    state court remedies available. <u>Smith v. Baldwin</u>, 510 F.3d 1127, 1139 (9th Cir. 2007)

7    (en banc) ("The Supreme Court has noted that a habeas petitioner who has defaulted

8    his federal claims in state court meets the technical requirements for exhaustion; there

9    are no state remedies any longer 'available' to him."), quoting <u>Coleman v. Thompson</u>,

10   501 U.S. 722, 732, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Cassett v. Stewart</u>, 406

11   F.3d 614, 621 n.5 (9th Cir. 2005); <u>see also</u> 28 U.S.C. § 2254(c) ("An applicant shall not

12   be deemed to have exhausted the remedies available in the courts of the State, within

13   the meaning of this section, if he has the right under the law of the State to raise, by any

14   available procedure, the question presented.") In such a situation the claim would likely

15   be procedurally defaulted in this Court. <u>Coleman</u>, 501 U.S. at 735 n.1 (Holding that a

16   procedural default arises when a petitioner has "failed to exhaust state remedies and the

17   court to which the petitioner would be required to present his claims in order to meet the

18   exhaustion requirement would now find the claims procedurally barred.").

19           Here, the 'technical exhaustion' doctrine applies to Petitioner's claims to which no

20   state remedies are available, even when the remedy is no longer available based on

21   Petitioner's failure to seek state court review in a timely manner. <u>See</u> <u>Woodford v. Ngo</u>,

22   548 U.S. 81, 92-93, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). In <u>Woodford</u>, the

23   Supreme Court described the technical exhaustion requirement as follows:

24           In habeas, state-court remedies are described as having been
             "exhausted" when they are no longer available, regardless of the reason
25           for their unavailability. <u>See</u> <u>Gray v. Netherland</u>, 518 U.S. 152, 161, 116 S.
             Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no
26           longer available because the prisoner failed to comply with the deadline
             for seeking state-court review or for taking an appeal, those remedies are
27           technically exhausted, <u>ibid.</u>, but exhaustion in this sense does not
             automatically entitle the habeas petitioner to litigate his or her claims in
28           federal court. Instead, if the petitioner procedurally defaulted those claims,

the prisoner generally is barred from asserting those claims in a federal habeas proceeding. Id., at 162, 116 S. Ct. 2074, 135 L. Ed. 2d 457; Coleman, supra, at 744-751, 111 S. Ct. 2546, 115 L. Ed. 2d 640.

Woodford, 548 U.S. at 92-93.

Clearly, recent Supreme Court authority requires this Court to consider claims that were not exhausted and no longer capable of review in state court as technically exhausted and subject to the doctrine of procedural default. Id. at 109 (Stevens, J., dissenting) ("[W]e decided no fewer than six cases in which we stated explicitly that a habeas petitioner satisfies the statutory exhaustion requirement so long as state-court remedies are no longer available to him at the time of the federal-court filing, regardless of the reason for their unavailability.") (listing cases). The Ninth Circuit has adhered to the technical exhaustion doctrine set forth by the Supreme Court. See Smith v. Baldwin, 510 F.3d 1127, 1139 (9th Cir. 2007); Cooper v. Neven, 641 F.3d 322, 327 (9th Cir. 2011).

1.    Do State Remedies Remain Available to Petitioner?

As the technical exhaustion doctrine is well established by the Supreme Court and Ninth Circuit, the Court must determine if Petitioner has any state remedies available. "In determining whether a remedy for a particular constitutional claim is 'available,' the federal courts are authorized, indeed required, to assess the likelihood that a state court will accord the habeas petitioner a hearing on the merits of his claim." Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) (quoting Harris v. Reed, 489 U.S. 255, 268, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (O'Connor, J., concurring)).

Although Petitioner's claims were filed without prejudice to allow her to re-file verified and signed petitions in state court, the question now presented is whether any attempt to do so would be considered untimely and barred by the state courts. California does not have a specific time limit for filing habeas petitions. The United States Supreme Court has described California's timeliness requirements as follows:

California directs petitioners to file known claims "as promptly as the circumstances allow." In re Clark, 5 Cal. 4th 750, 765, n. 5, 21 Cal. Rptr. 2d 509, 855 P.2d 729, 738, n. 5 (1993). Petitioners are further instructed to state when they first learned of the asserted claims and to explain why

14

1   they did not seek postconviction relief sooner. <u>In re Robbins</u>, 18 Cal. 4th
    770, 780, 77 Cal. Rptr. 2d 153, 959 P.2d 311, 317-318 (1998). Claims
2   substantially delayed without justification may be denied as untimely. <u>Ibid.</u>;
    <u>Clark</u>, 5 Cal. 4th, at 765, n. 5, 855 P. 2d, at 738, n. 5.

3   <u>Walker v. Martin</u>, 131 S. Ct. 1120, 1124 (2011).

4           Petitioner was notified that her petition was not signed and verified, and therefore

5   not reviewed by the Calaveras County Superior Court, on September 25, 2009. (Lodged.

6   Doc. 8.) Petitioner did not attempt to re-file the petition, and over four years have since

7   passed. It is without question that Petitioner's delay would be considered unreasonable

8   under state law and any subsequent petition would be denied as untimely.  There are

9   exceptions to California's timeliness requirement, but none appear to be relevant and

10  none were  raised by Petitioner. <u>In re Robbins</u>, 18 Cal. 4th 770 at 780-781.

11          Requiring Petitioner to return to state court to attempt to exhaust her state court

12  remedies would frustrate the pursuit of justice. "[D]ismissing such petitions for failure to

13  exhaust state court remedies would often result in a game of judicial ping-pong between

14  the state and federal courts, as the state prisoner returned to state court only to have the

15  state procedural bar invoked against [her]." <u>Harris v. Reed</u>, 489 U.S. 255, 269-270, 109

16  S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (O'Connor, J., concurring).

17          Accordingly, this Court finds that the claims are technically exhausted and subject

18  to procedural default based on California's timeliness rules.

19                          2.      Exceptions to Procedural Default

20          Nevertheless, "'[i]f a petitioner has procedurally defaulted on a claim, a federal

21  court may nonetheless consider the claim if she shows: (1) good cause for his failure to

22  exhaust the claim; and (2) prejudice from the purported constitutional violation; or (3)

23  demonstrates hearing the claim would result in a fundamental miscarriage of justice.'"

24  <u>Cooper</u>, 641 F.3d at 327 (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 750, 111 S. Ct.

25  2546, 115 L. Ed. 2d 640 (1991)) (further citation omitted). "An objective factor outside of

26  a petitioner's control (e.g., ineffective assistance of counsel or a basis for the claim that

27  was previously unavailable) could constitute cause. The petitioner can meet the

28  prejudice prong if he demonstrates that the errors . . . worked to his actual and

1    substantial disadvantage, infecting his entire proceeding with errors of constitutional

2    dimension. A petitioner can demonstrate a fundamental miscarriage of justice by

3    establishing that under the probative evidence he has a colorable claim of factual

4    innocence." Cooper, 641 F.3d at 327 (citations and internal quotation marks and

5    punctuation omitted).) "Constitutionally ineffective assistance of counsel plus actual

6    prejudice will satisfy this test and allow habeas review of a procedurally defaulted claim."

7    Walker v. Martel, 709 F.3d 925, 938 (9th Cir. 2013) (citing McCleskey v. Zant, 499 U.S.

8    467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991)).

9        Petitioner raises several claims and sub-claims alleging that counsel was

10   ineffective. Before addressing the substance of the claims, the Court notes that the

11   prosecution had a strong case against Petitioner based on significant amounts of

12   evidence. As described by the state court, Petitioner worked for the victim as a

13   housekeeper, and was having financial difficulties. Down the road from the crime scene

14   items were found related to the crime, including the victim's checkbook with Defendant's

15   fingerprints on it, a hammer with the victims' blood, bloody jeans of comparable size to

16   those worn by Petitioner with Petitioner's and the victim's DNA, a bloody t-shirt

17   resembling one worn by Petitioner in a local mini-mart on the night of the crime, and

18   checks from the victim to Petitioner along with Petitioner's deposit slips corresponding to

19   those checks. Further, many of the items were found in a toilet wax ring box, and it was

20   shown that Petitioner purchased and installed toilets the day before the crime.

21   Afterwards, Petitioner attempted to have a friend present a fabricated story that she was

22   framed and the evidence was planted by the real killer. Based on the extensive and

23   strong evidence implicating Petitioner in the crime, the Court must view the

24   reasonableness of the actions of defense counsel in that context.

25       Petitioner presents numerous claims of ineffective actions by defense counsel.

26   She asserts that he failed to inform her of an in chamber meeting with the judge and the

27   prosecution regarding new exculpatory evidence and witnesses, but fails to describe the

28   evidence or witnesses, and how they would have assisted her defense. (Am. Pet., ECF

No. 17 at 9-14.) Petitioner also claims that counsel was ineffective in his handling of alleged destruction of evidence, failing to object to damaging evidence that was admitted in trial, failing to investigate and perform further scientific testing, failing to present expert witnesses at trial, failing to have material witnesses testify, and failing to object when the prosecution misstated the evidence. (Id.) However, all of the claims presented by Petitioner are cursory in nature, and do not describe in specific detail what further evidence could have been presented, or how the prosecution's case could have been refuted.

In determining claims of ineffective assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result is reliable." Id. at 687. The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United

1    States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

2        In this case, Petitioner has not shown that counsel's conduct was deficient or that

3    she was prejudiced by the conduct. Petitioner suggests that counsel could have

4    performed further investigations and presented additional evidence and witnesses.

5    However, Petitioner provides little in the way of specific details regarding how the

6    additional information would have changed the outcome at trial. For example, Petitioner

7    asserts that counsel did not inform Petitioner of an in chamber meeting in which new

8    exculpatory evidence was discussed, but Petitioner does not provide any information

9    about the allegedly exculpatory information. She also alleges that exculpatory

10   information was destroyed, but mentions only  a t-shirt and a gas receipt. (Am. Pet., ECF

11   No. 17 at 11.) Petitioner does not describe how those pieces of evidence would have

12   supported her defense. Petitioner asserts that counsel did not attempt to obtain further

13   forensic evidence, such as DNA from the victim's fingernails to see if there was evidence

14   of a different assailant. However, counsel did not act unreasonably in not attempting to

15   obtain forensic evidence in light of the possibility that the new evidence might only

16   provide more evidence linking Petitioner to the crime. Further, Petitioner claims that

17   counsel failed to object when the prosecution made alleged misstatements about the

18   evidence. Even if counsel could have objected, the jury was provided instructions

19   regarding what was to be considered as evidence, and it is presumed that the jury

20   followed the instructions. Clerks Tr. 330-31; Schlup v. Delo, 513 U.S. 298, 329 (1995) ("It

21   must also be presumed that such a juror would conscientiously obey the instructions of

22   the trial court…").

23       As stated, strong evidence, including forensic evidence, implicated Petitioner in

24   the murder. Petitioner has provided mostly cursory arguments and allegations regarding

25   how counsel's actions were unreasonable or resulted in prejudice. Petitioner has not

26   shown that counsel was ineffective, and she cannot obtain relief from procedural default

27   on that ground.

28       Likewise, Petitioner has not made a showing of actual innocence as required

under Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), and House v. Bell, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006), to overcome the procedural bar. Petitioner's cursory claims of additional or destroyed evidence do not raise real concerns regarding her innocence. Petitioner has not shown that it is more likely than not that no reasonable juror would have convicted her in light of the evidence presented in her federal petition. As Petitioner has not shown cause and prejudice or actual innocence to provide an exception to the procedural bar, her first, fourth, ninth, and tenth claims are denied as procedurally defaulted.

### 2.   Claims 2, 3, 5, and 6

#### a.   Procedural History

Respondent asserts that claims two, three, five and six of Petitioner's federal petition were denied as untimely under state law and therefore procedurally barred. As each of the claims were presented in different procedural contexts, the Court shall describe how each claim was presented on state collateral review.

#### 1.   Claim 2

In claim two of her federal petition, Petitioner claims that counsel was ineffective due to a conflict of interest arising from the fact that counsel's brother-in-law was the director of the state crime lab where evidence in the case was examined. (Am. Pet., ECF No. 17 at 15.)

Petitioner presented this claim in a writ of habeas corpus filed with the Calaveras County Superior Court on April 22, 2011. (Lodged Doc. 25.) The petition was denied in a reasoned decision on the same day. (Lodged Doc. 26.) Petitioner filed a petition for writ of habeas corpus in the Third District Court of Appeal on May 11, 2011, asserting the same claim. (Lodged Doc. 27.) The petition was denied in a summary decision on May 12, 2011. (Lodged Doc. 28.) Petitioner then raised the claim before the California Supreme Court. On September 28, 2011, the court denied the petition citing to In Re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5, Cal.4th 750, 767-769 (1993). (Lodged Docs. 28-29.) Accordingly, the California Supreme Court denied the petition as

untimely. See Walker v. Martin, 131 S. Ct. 1120, 1124 (2011).

2.      Claim 3

In claim three of her federal petition, Petitioner claims that counsel was ineffective for failing to thoroughly review all police reports for discrepancies and thereby allowed tainted evidence to be admitted into trial. (Am. Pet., ECF No. 17 at 17.)

Petitioner presented this as the second claim in a writ of habeas corpus filed with the Calaveras County Superior Court on February 4, 2011. (Lodged Doc. 21.) The petition was denied in a reasoned decision on February 7, 2011. (Lodged Doc. 22.) Petitioner filed a petition for writ of habeas corpus in the Third District Court of Appeal on February 22, 2011, asserting the same claim. (Lodged Doc. 23.) The petition was denied in a summary decision on February 24, 2011. (Lodged Doc. 24.) Petitioner then raised the claim before the California Supreme Court. On September 28, 2011, the court denied the petition as untimely citing to In Re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5, Cal.4th 750, 767-769 (1993). (Lodged Docs. 17-18.)

3.      Claim 5

In claim five of her federal petition, Petitioner claims that procedural neglect resulted in the destruction of evidence and the illegal introduction of tainted evidence at trial. (Am. Pet., ECF No. 17 at 24-25.)

Petitioner presented this claim in a writ of habeas corpus filed with the Calaveras County Superior Court on November 8, 2010. (Lodged Doc. 11.) The petition was denied in a reasoned decision on November 9, 2010. (Lodged Doc. 12.) Petitioner filed a petition for writ of habeas corpus in the Third District Court of Appeal on January 12, 2011, asserting the same claim. (Lodged Doc. 15.) The petition was denied in a summary decision on January 27, 2011. (Lodged Doc. 16.) Petitioner then raised the claim before the California Supreme Court. On September 28, 2011, the court denied the petition as untimely citing to In Re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5, Cal.4th 750, 767-769 (1993). (Lodged Docs. 17-18.)

4.    Claim 6

In claim six of her federal petition, Petitioner claims that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on direct appeal. (Am. Pet., ECF No. 17 at 26-28.)

Petitioner presented this claim in a writ of habeas corpus filed with the Calaveras County Superior Court on December 10, 2010. (Lodged Doc. 19.) The petition was denied in a reasoned decision on the same day. (Lodged Doc. 20.) Petitioner filed a petition for writ of habeas corpus in the Third District Court of Appeal on January 12, 2011, asserting the same claim. (Lodged Doc. 15.) The petition was denied in a summary decision on January 27, 2011. (Lodged Doc. 16.) Petitioner then raised the claim before the California Supreme Court. On September 28, 2011, the court denied the petition as untimely citing to In Re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5, Cal.4th 750, 767-769 (1993). (Lodged Docs. 17-18.)

As described, claims two, three, five and six were all denied by the California state courts as untimely.

b.    Analysis

Petitioner's claims two, three, five and six are potentially procedurally barred by the California Supreme Court's decisions to deny state habeas review because the petitions were untimely. As described above, a procedural bar precludes federal habeas review when the state court's denial of review was based on a petitioner's failure to meet an "independent and adequate" state procedural requirement. Coleman, 501 U.S. at 729-30.

Here, Petitioner's claims were denied with  citations to In Re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5, Cal.4th 750, 767-769 (1993), indicating that Petitioner had failed to meet the state's timely filing requirement. See Walker v. Martin, 131 S. Ct. at 1124. California's "substantial delay" timeliness standard satisfies the "independent and adequate" requirement. See Bennet v. Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003) (finding that California's timeliness standard is independent of federal

21

1    law); <u>Walker</u>, 131 S. Ct. at 1131 (finding that California's timeliness standard is

2    adequate). Therefore, Petitioner is procedurally barred from seeking habeas review.

3    Moreover, as discussed above, Petitioner has not shown cause or prejudice or made a

4    showing of actual innocence to overcome the procedural bar. Accordingly, claims two,

5    three, five and six are procedurally barred. As claims one, four, nine and ten were also

6    procedurally barred, only claims seven and eight remain pending, and are discussed

7    below.

8    **B.    Review of Claims on the Merits**

9    1.    <u>Claim Seven – Admission of Hearsay Testimony</u>

10   Petitioner contends the trial court violated her constitutional rights in allowing the

11   prosecution to present unreliable hearsay statements at trial. (Am. Pet., ECF No. 17 at

12   29.) Specifically, Petitioner claims that statements made by witnesses to an investigating

13   officer regarding what they saw at the mini-mart near the crime scene were allowed into

14   evidence. (<u>Id.</u>)

15   a.    State Court Decision

16   Petitioner presented her claim in her direct appeal to the California Court of

17   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

18   Court of Appeal and summarily denied in subsequent petition for review by the California

19   Supreme Court. (<u>See</u> Lodged Docs. 2-6.) Since the California Supreme Court denied the

20   petition in a summary manner, this Court "looks through" the decisions and presumes

21   the Supreme Court adopted the reasoning of the Court of Appeal, the last state court to

22   have issued a reasoned opinion. See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3

23   (1991) (establishing, on habeas review, "look through" presumption that higher court

24   agrees with lower court's reasoning where former affirms latter without discussion); <u>see</u>

25   <u>also</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts

26   look to last reasoned state court opinion in determining whether state court's rejection of

27   petitioner's claims was contrary to or an unreasonable application of federal law under

28   28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Court of Appeals explained that:

5. Third Party Culpability

The manager of an Angels Camp mini-mart told Detective Jim Stenquist that one of her store clerks had seen a woman--who did not fit defendant's description--in the store with blood or oil on her hands between 7:00 and 8:00 p.m. the night Shires was killed. A customer at the store who had overheard the manager and the detective talking told the detective that she (the customer) knew of the woman the manager was describing, and that the woman had been working on her car at the residence of Billy B., who lived about three blocks from the mini-mart.

Detective Stenquist then checked with Billy B., who echoed the customer's account. Billy stated that he and a woman named Cheryl S. had been working on her car "the last few weeks," that they had "probably" worked on the car on the evening of September 16, 2004, and that he had sent Cheryl to the mini-mart "to get items." The detective then confirmed that indeed it was Cheryl's registered car on Billy's property--with its hood up and surrounded by cans of motor oil and transmission fluid (which is red). The detective also checked with the original source of the information regarding the allegedly bloody-handed woman, the mini-mart store clerk (Ann F.), who said the substance on the woman in the store "possibly could have been motor oil." Based on all this information, Detective Stenquist did not contact Cheryl, concluding that the woman in the mini-mart with the substance on her hands did not pertain to the Shires murder.

Ann F., the mini-mart store clerk, testified for the defense. She stated that on a September 2004 evening, between 9:30 and 10:00 p.m., a woman, who was not defendant, came into the store with dried blood all over her hands. Ann did not think the substance was transmission fluid, but admitted she had never seen dried transmission fluid. The woman wandered around the store, bought a snack, and ate it in the store.

The evidence of the statements to Detective Stenquist from the (eavesdropping) mini-mart customer and from Billy B. is the subject of defendant's first issue on appeal, to which we turn now.

Discussion

1. Allegedly Inadmissible Hearsay Statements from Mini-mart Customer and from Billy B.

Defendant contends the trial court erred in admitting these hearsay statements, which undermined defendant's third party culpability defense involving the allegedly bloody-handed woman observed in the Angels Camp mini-mart on the night of the murder. We find no error because the evidence was properly admitted for a nonhearsay purpose and the jury was instructed accordingly.

These statements were admitted in the following manner. In a reported discussion outside the jury's presence, the prosecutor asked the trial court if it was going to allow the defense to question Detective Stenquist about the allegedly bloody-handed woman, even if the prosecutor did not raise this issue with Detective Stenquist. Defense

counsel responded that he was "obviously going to ask [Detective Stenquist] what he did to investigate this case and what he didn't do to investigate this case," explaining that such questioning went "to [Detective Stenquist's] credibility, his bias, his motive and his interest, and [was] certainly fair fodder for cross-examination." The trial court agreed.

In light of this ruling, the prosecutor then asked Detective Stenquist on direct examination (1) what information the eavesdropping mini-mart customer had provided him about the identity of the supposedly bloody-handed woman in the mini-mart on the night of the murder, and (2) what Billy B. had told the detective in this regard as well.

Defendant unsuccessfully objected to both of these inquiries on hearsay grounds. In each instance, the trial court instructed the jury that the statements from the mini-mart customer and from Billy B. were not being admitted for the truth of the matters stated, but only to explain Detective Stenquist's investigation into the matters based on the detective's state of mind. (As noted, the customer stated she knew of the allegedly bloody-handed woman whom the mini-mart manager had described and this woman was working on her car at Billy B.'s, and Billy B. confirmed the customer's account and provided the woman's name, Cheryl S.)

We conclude the trial court acted properly. As defense counsel had argued, what Detective Stenquist did and did not do to investigate this case, especially with respect to the allegedly bloody-handed woman at the mini-mart on the night of the murder, was relevant. The prosecution was entitled to have Detective Stenquist explain his investigation regarding this woman, if the defense was going to criticize that investigation as lacking. Detective Stenquist's investigation in this regard was based on the information he had obtained from the mini-mart customer and from Billy B. That information was consistent and exculpatory as to the supposedly bloody-handed woman. Detective Stenquist then combined this information with his observation of the ongoing car repair at Billy B.'s, his confirmation that the car being repaired was registered to Cheryl S., and the subsequent equivocations from mini-mart clerk Ann F. concerning the substance on the woman's hands, to conclude the bloody-handed woman theory was a dead end.

Because Detective Stenquist's investigative actions were at issue in this case, and because those actions were based on statements from the mini-mart customer and from Billy B., these statements constituted nonhearsay evidence that was admissible to show the detective's (i.e., the hearer's) actions in conformity with the statements. The statements were not hearsay and were admissible because it was how Detective Stenquist acted in light of the statements, not the truth of the matter asserted in the statements, which was the relevant fact sought to be proved. (People v. Scalzi (1981) 126 Cal.App.3d 901, 907, and authorities cited therein.) n3

[FN3] In light of our resolution of the hearsay issue, defendant's related contentions that the trial court violated her constitutional right to confrontation and constitutional due process right to be convicted on reliable evidence--if not forfeited--fall as well. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 1, pp. 679-680 [hearsay rule functions to preserve confrontation and reliable evidence].)

1   People v. Ordway, 2009 Cal. App. Unpub. LEXIS 727, 9-13 (Cal. App. 3d Dist. Jan. 28, 2009).

2                              b.     Legal Standard

3          The Sixth Amendment to the United States Constitution grants a criminal

4   defendant the right "to be confronted with the witnesses against him." U.S. Const.

5   amend. VI. "The 'main and essential purpose of confrontation is to secure for the

6   opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections

7   for California, 692 F.3d 910 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S.

8   673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth

9   Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

10         In 2004, the United States Supreme Court held that the Confrontation Clause bars

11  the state from introducing into evidence out-of-court statements which are "testimonial"

12  in nature unless the witness is unavailable and the defendant had a prior opportunity to

13  cross-examine the witness, regardless of whether such statements are deemed reliable.

14  Crawford v. Washington, 541 U.S. 36 (2004). The Crawford rule applies only to hearsay

15  statements that are "testimonial" and does not bar the admission of non-testimonial

16  hearsay statements. Id. at 42, 51, 68. See also Whorton v. Bockting, 549 U.S. 406, 420

17  (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial

18  statement.").

19         Although the Crawford court declined to provide a comprehensive definition of the

20  term "testimonial," it stated that "[s]tatements taken by police officers in the course of

21  interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at

22  52. The court also provided the following "formulations" of a "core class" of testimonial

23  statements: (1) "ex parte in-court testimony or its functional equivalent - that is, material

24  such as affidavits, custodial examinations, prior testimony that the defendant was unable

25  to cross-examine, or similar pretrial statements that declarants would reasonably expect

26  to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized

27  testimonial materials, such as affidavits, depositions, prior testimony, or confessions;"

28  and (3) "statements that were made under circumstances which would lead an objective

1   witness reasonably to believe that the statement would be available for use at a later

2   trial." Id. at 51-52. The court in Crawford also pointed out that the Sixth Amendment

3   Confrontation Clause "does not bar the use of testimonial statements for purposes other

4   than establishing the truth of the matter asserted." Id. at 59, n.9. However, "state

5   evidence rules do not trump a defendant's constitutional right to confrontation," and a

6   reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate,

7   nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the

8   Confrontation Clause's application." (citation omitted). Williams v. Illinois,     U.S.   , 132

9   S.Ct. 2221, 2226, 183 L. Ed. 2d 89 (2012).

10      Further, Confrontation Clause violations are subject to harmless error analysis.

11   Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of

12   habeas petitions, the standard of review is whether a given error 'had substantial and

13   injurious effect or influence in determining the jury's verdict.'" Christian v. Rhode, 41 F.3d

14   461, 468 (9th Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

15   Factors to be considered when assessing the harmlessness of a Confrontation Clause

16   violation include the importance of the testimony, whether the testimony was cumulative,

17   the presence or absence of evidence corroborating or contradicting the testimony, the

18   extent of cross-examination permitted, and the overall strength of the prosecution's case.

19   Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

20                                b.        Analysis

21      At issue is whether the witnesses' statements to Detective Stenquist constituted

22   testimonial hearsay in violation of the Supreme Court's holding in Crawford.

23      Tthe Supreme Court explained that the Confrontation Clause "does not bar the

24   use of testimonial statements for purposes other than establishing the truth of the matter

25   asserted." Crawford, 541 U.S. at 59 n.9. The witnesses' statements at issue here were

26   only admitted to show Detective Steinquist's actions in conformity with the statements.

27   Thus, Crawford is simply inapplicable.  See also Moses v. Payne, 555 F.3d 742, 755-56

28   (9th Cir. 2009) (holding that Crawford did not apply to a social worker's testimony about

1   statements made by the petitioner's son because the hearsay was admitted to explain

2   why the social worker contacted the authorities and not "to prove the truth of the matter

3   asserted"); United States v. Mitchell, 502 F.3d 931, 966 (9th Cir. 2007) (holding that

4   Crawford did not apply to "[t]estimony by a patrol officer about information an eyewitness

5   gave her" because the hearsay "was offered as a basis for action, not for its truth"). The

6   statements were provided to explain why Detective Stenquist did not continue to pursue

7   an investigation regarding the woman seen in the store with transmission fluid on her

8   person and not for the fact of the matter asserted.

9        Moreover, even if the admission of the witnesses' statements to Detective

10  Stenquist violated Petitioner's constitutional rights under the Confrontation Clause, any

11  error was harmless under the Brecht standard. See Slovik v. Yates, 556 F.3d 747, 755

12  (9th Cir. 2009) ("Confrontation Clause errors are subject to harmless-error analysis.");

13  Indeed, the evidence implicating Petitioner in the murder was very strong. See Allen v.

14  Woodford, 395 F.3d 979, 992 (9th Cir. as amended Jan. 24, 2005) ("[T]o the extent that

15  any claim of error . . . might be meritorious, we would reject that error as harmless

16  because the evidence of [the petitioner's] guilt is overwhelming."). Even if Petitioner

17  could have presented a stronger alibi based on other witnesses' observing what they

18  perceived to be a woman in the mini-mart with blood on her person, there was strong

19  evidence against Petitioner, including evidence that she took financial advantage of the

20  victim and physical evidence linking her  to the killing.

21       In sum, the Court concludes that the admission of the witnesses' statements to

22  Detective Stenquist's did not violate Petitioner's constitutional rights. Moreover, even if

23  was erroneously admitted, the error was harmless. Thus, the Court concludes that the

24  state courts' denial of this claim was not contrary to nor did it involve an unreasonable

25  application of clearly established federal law as determined by the United States

26  Supreme Court, nor was it an unreasonable determination of the facts. See 28 U.S.C. §

27  2254(d). Petitioner is not entitled to habeas relief on this claim.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.   Claim Eight – Insufficient Evidence of Special Circumstance Allegation

Petitioner contends that there was insufficient evidence to prove the special circumstance allegation that Petitioner committed the murder to prevent the victim from testifying in a criminal proceeding. (Am. Pet., ECF No. 17 at 32-34.)

a.   State Court Decision

Petitioner presented her claim in her direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the Court of Appeal and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 2-6.) Since the California Supreme Court denied the petition in a summary manner, this Court "looks through" the decisions and presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Court of Appeal explained that:

2. Sufficiency of Evidence Regarding Special Circumstance of Witness-Murder

Defendant contends the evidence is insufficient to support the special circumstance finding that defendant killed Shires to prevent him from testifying in a criminal proceeding. (§ 190.2, subd. (a)(10).) We disagree.

In reviewing the sufficiency of evidence in a criminal appeal, we review the evidence in the light most favorable to the judgment and determine whether any rational trier of fact could have found the elements at issue beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 576-578; People v. Guerra (1985) 40 Cal.3d 377, 385.)

As pertinent here, three elements comprise the witness-murder special circumstance: (1) the victim witnessed a separate crime prior to

being killed; (2) the defendant intended to kill the victim; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he had witnessed. (People v. Stanley (1995) 10 Cal.4th 764, 801 (Stanley).) The trial court properly instructed the jury with these three elements. (CALCRIM No. 725.)

"The relevant fact under this [special] circumstance is that the defendant believes that he or she is exposed to criminal prosecution, not that in fact criminal proceedings are pending or contemplated." (3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) § 457, p. 610; People v. Weidert (1985) 39 Cal.3d 836, 853-854.) Consequently, it is the accused's subjective intent that is relevant in proving this special circumstance. (Weidert, supra, at p. 853.) And killing for the purpose of preventing the victim from testifying about the crime he had witnessed does not have to be the sole or predominant purpose of the killing. (Stanley, supra, 10 Cal.4th at pp. 800-801.)

Defendant concedes the evidence is sufficient to prove the first two elements of this special circumstance: Shires witnessed a separate crime (forgery/theft), and defendant intentionally killed Shires.

Defendant's evidentiary challenge is to the third element. Defendant argues: "[T]here was absolutely no evidence to prove that the purpose of the intentional killing was to prevent [Shires] from testifying against [defendant] about the crimes involving [Shires's] checks. There was no evidence that [Shires] had reported [defendant's] criminal conduct with his checks, no statements by [defendant] that she feared that [Shires] was going to report her criminal conduct with his checks, and no evidence of any law enforcement investigation of [defendant's] criminal conduct with [Shires's] checks prior to the murder. [P] [Defendant's] case is entirely different from People v. Ledesma (2006) 39 Cal.4th 641 [(Ledesma)] and People v. Sanders (1990) 51 Cal.3d 471 . . . . In Ledesma, the court [found sufficient evidence of the third element by relying] on the defendant's statement that if he 'got rid of the witness, he wouldn't have a witness to testify against him.' (Ledesma, supra, at p. 723.) In Sanders, the court relied on the defendant's expression of concern that one of the victims of a robbery attempt could identify him. (Sanders, supra, at p. 520.) In contrast, there is no evidence of any statement by [defendant here] to show that the purpose of the killing was to prevent [Shires] from testifying."

Defendant has framed her sufficiency argument too narrowly, essentially basing it on direct evidence of the third element. Because this third element involves defendant's purpose underlying the killing--i.e., her criminal intent--circumstantial evidence has a role to play. Direct evidence is not required. Indeed, a defendant's criminal intent is often proved through circumstantial evidence because criminal defendants often do not expressly state what was on their mind regarding the crime. (See People v. Patino (1979) 95 Cal.App.3d 11, 27.) As Ledesma itself recognized regarding the evidence before it, "[t]he circumstances of the offense also support the conclusion that the victim was killed to prevent his testimony." (Ledesma, supra, 39 Cal.4th at p. 723.) As we shall see, it is the circumstantial evidence that is defendant's undoing here.

As the People note, defendant herself testified that she knew she had committed a crime by taking and depositing checks from Shires's

bank account and that she was going to get in trouble for it. When originally questioned by the police, defendant lied about Shires giving her money. Defendant also acknowledged to officers that she felt she was taking advantage of Shires. Moreover, defendant was financially strapped at the time of Shires's death. One reason for killing a financial lifeline during a time of financial distress would be if the lifeline had become aware he was being criminally exploited.

Aside from evidence from defendant herself, there was evidence from Debbie N. that Shires had stated he was having a problem with his current housekeeper, and Shires repeatedly told Debbie and Amy S. that he needed a housekeeper he could trust who would not take advantage of him. Shires made these statements only about a week before his death.

Defendant's forgery and theft involved Shires's checks and checking account, and deposit slips with defendant's name, signature and account number. This meant there was a paper trail of wrongdoing. As the prosecutor argued, Shires's upcoming bank statement, especially regarding the September 14, 2004, check and deposit, would prove very troubling for defendant. A treasure trove of this paper evidence--torn up, secreted in a taped-up box and dumped in a vacant, trashy, overgrown, unlit area--pointed to defendant.

This evidence, then, from defendant's own mouth, from statements Shires made shortly before his death, and from the paper trail of forgery and theft, revealed a timing and motive for Shires's death that led to defendant. Although it is at least arguable the $ 2,500 defendant obtained from Shires in mid-August 2004 may have been a loan, the same cannot be said for the $ 2,500 defendant obtained on September 14. The evidence showed only outright theft as to this transaction, accomplished via defendant's forgery. Shires was murdered on September 16.

We conclude there is sufficient evidence to sustain the special circumstance finding that defendant killed Shires to prevent him from testifying against defendant concerning the forgery and theft involving Shires's checking account.

People v. Ordway, 2009 Cal. App. Unpub. LEXIS 727, 13-18 (Cal. App. 3d Dist. Jan. 28, 2009).

b.    Analysis

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only by proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the Jackson standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

1    In applying the Jackson standard, the federal court must refer to the substantive

2  elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16.

3  A federal court sitting in habeas review is "bound to accept a state court's interpretation

4  of state law, except in the highly unusual case in which the interpretation is clearly

5  untenable and amounts to a subterfuge to avoid federal review of a constitutional

6  violation." Butler v. Curry, 528 F.3d 624, 642 (9th Cir. 2008) (quotation omitted).

7    Petitioner argues that there is insufficient evidence to support the finding of the

8  special circumstance that the murder was committed to prevent the victim from testifying.

9  Specifically, Petitioner asserts that there was insufficient evidence to prove the third

10 element that the purpose of the killing was to prevent the victim from testifying about the

11 crime he had witnessed. As the California Court of Appeals explained, there was no

12 direct evidence of Petitioner making overt statements that the killing was made to

13 prevent the victim from testifying. However, based on the totality of the circumstances,

14 including the fact that the victim was murdered at the same time that Petitioner was

15 financially defrauding the victim, plus the fact that evidence of the financial fraud was

16 dumped with evidence relating to the murder, created a strong inference that the murder

17 was committed to prevent the victim from discovering or eventually testifying regarding

18 the financial fraud perpetrated by Petitioner. The fact that there were no overt statements

19 regarding Petitioner's motive does not undermine the state court's finding that there was

20 sufficient evidence to support the finding on the special circumstance. The Court

21 therefore finds that the state appellate court's analysis was based on the correct federal

22 legal standard and did not unreasonably apply federal law in evaluating Petitioner's

23 sufficiency of the evidence claim.

24    Under Jackson and AEDPA, the state decision is entitled to double deference on

25 habeas review. Based on the Court's independent review of the trial record, it is

26 apparent that Petitioner's challenge to whether there was sufficient evidence to support

27 the special circumstance finding is without merit. There was no constitutional error, and

28 Petitioner is not entitled to relief with regard to this claim.

**V.      RECOMMENDATION**

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   May 30, 2014                        /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE